The last case on the calendar today is 21-35672 Reynolds. Oh, it looks like both of you are going to be by video. I just have one, though. Hang on one second, counsel. I can't see two lawyers yet. I'm sorry, Your Honor. I've been blocked. I accidentally tried to... Oh, there you are. There you are. Okay, good. Thank you. So can you both hear us here in the courtroom? Yes, ma'am. Okay, great. We can hear you as well, so we're ready to hear your argument. Please begin when you're ready. Good morning, Your Honors. Christopher Dillard representing Zachary Reynolds, plaintiff appellant in this case. Our primary argument here is that the AOJ did not properly accommodate all of the limitations relating to Mr. Reynolds' multiple sclerosis. In particular, the attendance issues that he would have. To kind of give background, he was diagnosed with multiple sclerosis back in 2010. At that time, an MRI showed demyelination in his brain and in his spinal cord. By 2018, that had significantly progressed and it was objectively documented. As early as 2016, he was having issues from that significant enough that he was requiring FMLA accommodations related to that. In 2018, he was put on short-term disability by his employer because of absences related to his multiple sclerosis. Then, when that ended, he went on unemployment and tried to find work that he could do. He actually obtained two jobs and he was not able to sustain either of those jobs again due to attendance issues related to his multiple sclerosis. In assessing the residual functional capacity, the AOJ assessed him as being absent 10 times a year, evenly spaced throughout the year. That is at odds with the evidence of his job performance. Honestly, there's no way that you can predict that there will be one absence every five weeks or so. That does not make sense. Counsel, that is one of the questions I have for both of you. Is there support in the record for the notion that the absences from work will be evenly spaced throughout the year? Where does that come from? That comes from the vocational consultant's testimony that 10 absences spaced throughout the year would be about the maximum that would be accepted. We're not communicating. That's the answer that the voc rehab expert gave in response to the question. I'm trying to figure out if there is any medical factual basis for the notion that the absences will be spaced evenly. The voc rehab expert didn't say they would be spaced evenly. No, but the only place that absences are kind of discussed is in some of the FMLA paperwork that his treating physician had given. Okay, thank you, ma'am. That there would be four absences or four flares per month lasting for a few days each time, which would suggest that there would be multiple absences during each month. Okay, so my question is, do we have any support in the record, one way or another, for the notion that the absences will be evenly spaced throughout the year? No. All right. And that becomes probative because, as the vocational consultant testified, even 10 absences, if they were concentrated, would preclude employment. Being off task more than 5% with the 10 absences would also be preclusive of employment. So the residual functional capacity assessment was actually tailored to meet the testimony from the hearing, rather than being based on the evidence that was before the judge. Part of this comes because multiple sclerosis, it doesn't seem like it was really understood by the parties that were involved at the hearing or even the examining physician. They didn't take account that there is no way to cure this disease. At best, treatment tries to reduce the number of relapses and to stay the progression of the disease. Even the vision issue, 2200 vision is not correctable when it's due to optical nerve damage. So there was a lot of seemingly misunderstandings of the impairment itself. Ultimately, it just comes down to, were the absences correctly accounted for? And I don't believe they were. And even a level of treatment is going to be, you have to look at the disease itself when you're considering something like that, whether you consider it conservative or even the frequency. Multiple sclerosis, there is no real treatment aside from the drugs. And as far as not taking nocrevus right away when it was prescribed, that's due in large part to interference by the insurance companies. It took several months for them to even start processing it. And then it took months to get him into the dosage. Well, in fairness, I think it took him several months to apply for it, right? There's an unexplained absence there for him requesting approval for the drug. The treating, Dr. Johnson put in the paperwork for the drug and then it was not processed right away. But that's nothing that Mr. Reynolds had any kind of control over. He's just kind of at the mercy of the process. Would you like to save time for rebuttal? Yes, Your Honor. Okay. We'll hear from opposing counsel, please. Good morning, Your Honor. May it please the court. Sarah Mohm on behalf of the Commissioner of the Social Security Administration. So when the ALJ constructed the residual functional capacity assessment, it is true that the ALJ had a conversation with the vocational expert about the outer bounds of what would be acceptable. Attendance limitations and time off task limitations. But the question here that is most important for determining whether or not the ALJ's construction of the RFC is harmful is whether or not the record indicates limitations that are different than or somehow in excess of those that were included in the RFC. As this court held in Johnson, the over-inclusion of debilitating factors in an RFC is not harmful error. So while there is, I think, understandably some discomfort about the manner in which those limitations were reached, that does not mean that those are necessarily harmful in the absence of indications of other limitations that ought to have been included in the RFC. And I think that one thing, like let's talk about... Other limitations. I'm trying to figure out. There's certainly indication that he has MS. There's certainly indication that he's had incontinence. He's testified that he was fired for that reason, that he had repeated problems, that he tried to wear diapers, that his coworkers were complaining because of the odor. I mean, you know all that. So this comes down to, it seems to me, his argument at page 35. He argues there's no evidence on the record to support the ALJ's finding that Mr. Reynolds would miss only 10 days of work per year, and then he said, or that these absences would be evenly spaced. And when the ALJ posed the, you know, as you noted, several hypotheticals to the voc rehab expert, there's this notion that they would be absently spaced, and I can't find support for that. And to your point about harmfulness, the ALJ does seem to indicate if they're not spaced that way, at some point this person becomes unemployable. Right. The vocational expert testimony indicates at some point that if the absences are not spaced in that way, then that the claimant would be disabled. Right. So what do we do about that? So I think I would return to the argument that I have been making, which is that the question is, is there evidence for absences presented in a different manner than the ALJ included in the RFC? So let's look, for example, at Dr. Johnson's opinion and Dr. Johnson's evaluation of Reynolds. When Reynolds went to Dr. Johnson, the one time he had an in-person appointment with him during the relevant period, when he was reportedly experiencing a flare of multiple sclerosis symptoms, the only findings on examination were some instability on tandem gait or heel-toe walking, and some mild tremor on finger-to-toe, or excuse me, not finger-to-toe, finger-to-nose touching. There wasn't any indication of the kind of severe limitations that would require any absence at all from work. And while Reynolds argues that he would need to work frequently and did miss work frequently due to incontinence issues, those issues are not well reflected in the record either. But the ALJ questioned him, and the ALJ said, I do see indications of incontinence, and you did report it to Phan, Dr. Phan. And we have the litigant's testimony, somewhat humiliating, I would think, that he's admitting that he's had this problem at work. He lost his job because of it. His coworkers were complaining that he smelled. Do you think there really isn't any indication that this was a problem for him, or is it the government's position he was not truthful? So, it's the government's position that his subjective symptom complaints about that issue are not well reflected in his treatment record. It is true that he told the agency that he experienced those problems, and it's true that he told the consultative evaluator that he experienced those problems. But when he treated with Dr. Johnson, Dr. Johnson's treatment notes don't reflect complaints of daily uncontrollable bowel incontinence. And one might expect that if that was the reason he indeed lost his job, that those complaints would be recorded in the treatment record. And they're simply not. It is true that Dr. Johnson noted bowel incontinence in an insurance authorization form. But there's no indication he included those in the treatment notes, or that Reynolds sought treatment for any kind of treatment for incontinence issues. I appreciate it could have been better documented, but it's not like it's not documented. And he certainly testifies to this, as I said, somewhat humiliating sequence of events. So I just want to make sure I understand the government's position. Are you questioning? Because my question had to do with whether there is support in the record for these episodes being evenly spaced, right? Now, I'm not sure if you're telling me that I should doubt whether they happen, or is this a response to the concern about the episodes being presented to the voc rehab expert in the RFC as evenly spaced? So what I am arguing is that to the extent that there might be a suggestion of absences in the record, those absences rely upon Reynolds' unreliable subjective symptom reports, and also upon Dr. Johnson's medical source opinion, which the ALJ reasonably discounted. And so, unless there's other evidence, other credible evidence in the record that there were absences, that there would be absences, then the ALJ's articulation of the absence limitation in the RFC, at most, is harmless error. Okay, so the ALJ did accept this testimony, accept that these episodes were happening. That's why the ALJ baked this into the question posed to the voc expert, right? So I don't mean, I... Or are you taking the position that that really was superfluous and didn't need to be a part of the question posed to the voc rehab? I am arguing that that was superfluous, and that it didn't need to be included in the question to the vocational rehabilitation expert. And when you... Thank you for the clarification. Sure. And when you look at the ALJ's decision, he expressly acknowledges that he's constructing a conservative residual functional capacity assessment, given the limitations in the treatment record, and given the limitations in Johnson's own subjective symptom complaints. Are there questions? Okay, the Commissioner thanks you for your time and respectfully requests you affirm. Thank you. Council, you have a few minutes. I'm hearing something. I thought you were trying to get my attention. I beg your pardon. Go right ahead. To start, you've been looking for the citation from the vocational testimony about the absences being concentrated, and that's on 72 of the certified administrative record. So what did you want to call our attention to on page 72? I think it's 72. 72, you've been asking about the concentration of absences. Yes. Question vocational consultant, and that's which page it is found on. Oh, yes. We have that. Yeah, that's fine. Okay. You had brought that up, so I was addressing that. I do have a related question, and my related question is there's a question I haven't seen before, which is this hypothetical about if this person is going to be 5% less productive or 10% less productive. And the voc rehab, now that you point me to page 73, I remember, the voc rehab person said that that's not really something that the dictionary of occupational titles really addresses, this notion of 5% less productive. Is that correct? Did I understand the testimony correctly? Yes, ma'am. So the voc rehab is relying on her, I think, her experience about that. Is that right? Yes, ma'am. That's typically when it comes to absences and off task time, that's usually based on their own experiences. Thank you. You're welcome, ma'am. And I think the commissioner's arguments, again, stem from a misunderstanding of the disease process. There would be no reason for Mr. Reynolds to seek treatment for incontinence because the incontinence is due to nerve damage related to the multiple sclerosis. The nerves relating to those muscles have been damaged. There's no repair in that, so there's no treatment available. Similarly, his eye problem, there's no treatment for that because the nerves have been damaged. There's no way to repair it. His limping and gait issues, although not really an issue because he's been limited to sedentary work, those are all related to nerve damage. It doesn't come back once you've, you know, you might get occupational therapy to help deal with some of that, but at the end of the day, the nerves are damaged and there's no comeback. And this is a progressive disease. It's going to continue wasting away at him until it eventually, you know, it will just become worse and worse over time. So it has progressed significantly between 2010 when it was first diagnosed and 2018 when he stopped working. He was unable to continue working. He tried to work several times, which is why he applied for unemployment, but he was not successful. So even if he did apply for unemployment because he believed he might be able to work, his efforts show that those beliefs were unfounded or mistaken. So if there are no other questions. It doesn't seem to be the case that there are. So thank you both for your arguments. Thank you. Thank you both. We'll take this matter under advisement.
judges: CHRISTEN, LEE, FORREST